**McEVOY CO. v. KELLEY et al.**

No. 12295.

United States Court of Appeals
Fifth Circuit.

Dec. 14, 1948.

Rehearing Denied Jan. 8, 1949.

George W. Rice, of Houston, Tex., for appellant.

A. D. Dyess, of Houston, Tex., and Henry L. Fist, of Tulsa, Okl., for appellee.

Before HOLMES, WALLER, and LEE, Circuit Judges.

HOLMES, Circuit Judge.

The appellees are owners of letters patent upon a device, known as Rotary Slip Lifter, and have filed application for a patent covering certain improvements thereon. On July 25, 1945, the appellees granted appellant a license to make, use, and sell the device covered by the patent. The agreement was in writing, and is in the record. It provides for payment to appellees by the appellant of certain minimum royalties.

This suit was filed by appellees against appellant to recover damages for failure to pay such royalties from July 1, 1946, to January 25, 1947, the date of termination of the agreement. The sole question on this appeal is whether under the wording of the agreement, and upon the undisputed facts, the appellant is liable for such minimum royalties. The case was tried by the court without a jury, judgment being rendered for the plaintiffs below, appellees here.

The appellant, defendant below, as Licensee of the patent, terminated the agreement. If the agreement had been terminated by the Licensors, we would have an entirely different question to decide, because the contract makes a separate and specific provision for each contingency. Part one provides that, if the Licensors terminate the contract because of a breach thereof by the Licensee, such termination shall be the Licensors' sole remedy for such breach; but part XII provides that, if the Licensee terminates it, such termination shall not affect the Licensee's obligation to pay any royalty that may have accrued up to the time of such termination. The crucial question is: does "any royalty" include "minimum royalty"? The court below held that it did, and we think so too.

The contract is long and complicated, consisting of fourteen printed pages containing twenty-one parts, or sub-divisions. Decisions from other states construing different contracts, which were terminated under different circumstances, are not controlling or even persuasive here, where the question is what the parties intended by, and what was done by them under, this contract. Their intention must be gotten from the plain language of the

written instrument, and the circumstances surrounding the parties at the time it was made.

■ A valid contract may stipulate the legal rights and liabilities of the parties upon its breach, and that is what this contract undertook to do. The appellant seems to predicate its entire appeal upon the provision of the contract as to the rights of the Licensors to terminate such agreement upon the failure of the Licensee to pay the stipulated royalties, actual or minimum, and the effect of the exercise of that right. The fallacy of this contention lies in the undisputed fact that the contract was not terminated by the Licensors but by the Licensee, in which event the applicable provision of the contract reads as follows:

"Should this agreement be terminated by Licensee, such termination shall not affect Licensee's obligation to pay any royalty that may have accrued up to the time of such termination, and Licensee agrees to pay Licensors the agreed royalty on all devices covered by any pending application or Letters Patent subject to this agreement then in process of manufacture or then manufactured and in stock, in accordance with the terms hereof, when and as used or sold by Licensee."

■ The appellant, having retained its rights as Licensee under the contract until sixty days after November 25, 1946, and the Licensors not having terminated the agreement, the trial court did not err in rendering a money judgment in favor of the plaintiffs for minimum royalties covering the period of time during which the Licensee kept its licensing rights. The judgment appealed from is

Affirmed.

LEE, Circuit Judge (dissenting).

Appellees brought suit against the appellant in the court below to recover $6844.-33, with interest, allegedly due as minimum royalties under a license agreement entered into by the appellees and appellant, permitting the appellant to manufacture and sell in designated territory certain oilfield equipment, covering which the appellees owned a patent.

Although there was provision for payment of regular royalties on devices covered, there is no claim for such royalties, and the contract provisions concerning them are only alluded to in an effort to interpret the expressed intent of the parties to the license agreement.[1] The question presented on appeal is whether the un-

---

[1] "The following is an extract of pertinent portions of the license agreement which forms the background for this suit:

"II.

\* \* \* \* \* \*

"During the life of this contract and beginning ninety (90) days from the date of the signing hereof, this agreement shall not be terminable for lack of diligence so long as the minimum royalty herein specified shall be paid. *Licensee agrees that to entitle it to retain the license* herein granted, a minimum royalty as follows shall be payable: [Emphasis added.]

"(a) For the first three years royalties on fifty (50) such devices per year.

"(b) Thereafter royalties on twenty-five (25) of such devices per year.

"In connection with such minimum royalty it is agreed that if in any year or years the royalty paid by Licensee exceeds the minimum above recited for that year or years, such excess may be taken into consideration and used by Licensee for its credit toward the minimum required in any year or years that the royalty called for by the actual sales of Licensee has not equaled the minimum specified, and in the event Licensee shall in any year pay royalty in excess of that called for by its actual sales in order to pay the minimum required for that year, and in any subsequent year shall have actual sales calling for a royalty in excess of the minimum, it may credit against royalty called for in excess of the minimum in the subsequent year the royalty paid in excess of that called for by actual sales in the said previous year, and Licensee shall be held to have complied with said minimum royalty requirement up to any specified date so long as its total royalty payments from the date of this agreement to such date shall equal the total of the annual minimum royalties specified for the same period.

"Failure on the part of the Licensee to account to Licensors for the annual minimum royalty hereunder shall constitute a breach of this contract and be cause for termination hereof in the man-

ambiguous wording of the license agreement or contract between the appellant and the appellees requires payment to the appellees by the appellant of the minimum royalty absolutely and independently of the termination provision. The majority holds that it does. Disagreeing with their holding, I do not read or import into the license contract an independent obligation to pay minimum royalties where the contract is terminated by the licensee. The minimum royalty is in the nature of a payment to keep the privilege of the licensee intact, and failure to pay it will do no more than give the licensors an option to terminate the agreement; and, when they do not choose to do this, there is no further remedy.

As is stated in paragraph II of the license agreement, "Licensee agrees *that to entitle it to retain the license herein granted,* a minimum royalty * * * shall be payable: * * *." This language imports no absolute obligation to pay a minimum royalty; it only sets forth the condition under which the licensee acquires the right to retain the license. Under the contract the condition (payment of minimum royalty) arises only in years when there have not been regular royalty payments in the amount of or exceeding the minimum royalty and where there is not a credit balance from prior years when regular royalties were paid in excess of the minimum. Further on in paragraph II, this provision appears: "Failure on the part of the Li-

ner and subject to the provisions of paragraph X hereof, and such termination shall be Licensors' sole remedy for such breach.

"In computing the annual minimum royalty hereunder, the sale of parts as provided in paragraph V hereof shall not be included.

"VI.

"Licensee agrees to pay to Licensors upon every device manufactured in the United States and used or sold by Licensee during the life of this agreement, and embodying an invention covered by any pending application for Letters Patent of the United States or any Letters Patent of the United States subject to this agreement, a royalty amounting to fifteen percent (15%) of the net amounts invoiced by Licensee for the use or sale of such device, it being understood and agreed that the Licensee shall be under no obligation to pay any royalty under any application that has been finally rejected by the Patent Office, or any Letters Patent that have been declared invalid by any Court of competent jurisdiction unappealed from; and Licensee further agrees to pay Licensors upon every device manufactured and used or sold by it in any foreign country, during the life of this agreement, a royalty equal to fifteen percent (15%) of the net amounts invoiced by Licensee for the use or sale of such device, it being understood and agreed that if Letters Patent of any such foreign country shall be issued and later declared invalid by any Court of competent jurisdiction unappealed from, Licensee shall thereupon be relieved of its obligation to pay any royalty on devices manufactured and used or

sold in said country. It is understood and agreed that only one royalty shall be payable on each sale or use under this agreement.

"VIII.

"Said royalty shall be payable to Licensors on or before the 25th day of each and every calendar month during the term of this agreement with respect to all amounts invoiced by Licensee during the calendar month next preceding.

"X.

"Should Licensee fail to make the royalty payments as specified Licensors may terminate this agreement by giving Licensee sixty days written notice of their intention to do so; provided, however, that if Licensee shall within the said period of sixty days correct the default by paying Licensors all royalty then payable to them, such notice shall be without effect and this agreement shall continue in full force and effect.

"XII.

"Licensee may terminate this agreement at any time by mailing or delivering sixty days' written notice to Licensors.

"Should this agreement be terminated by Licensee, such termination shall not affect Licensee's obligation to pay any royalty that may have accrued up to the time of such termination, and Licensee agrees to pay Licensors the agreed royalty on all devices covered by any pending application or Letters Patent subject to this agreement then in process of manufacture or then manufactured and in stock, in accordance with the terms hereof, when and as used or sold by Licensee."

censee to account to Licensors for the annual minimum royalty * * * shall * * * be cause for termination hereof in the manner and subject to the provisions of paragraph X hereof, *and such termination shall be the Licensors' sole remedy for such breach."* In the light of these italicized extracts from the contract, it is impossible for me to understand how a claim for damages for such failure may be sustained.

Paragraph VI, as set out (see footnote), provides for regular royalties payable on each of the machines or devices manufactured in the United States and used or sold. This royalty is referred to in the agreement as "royalty." Paragraph VIII calls for a monthly settlement with the licensors as regards the regular royalty, instead of annually as is provided in the provision for payment of minimum royalties.

Paragraph X provides for termination by the licensors when the regular royalty payments are not made by the licensee, together with the procedure for termination, and fixes a period in which default may be corrected by the licensee. This paragraph, with respect to procedure and the default period, is by the express language of Paragraph II made applicable to termination by the licensors when the regular royalty during a twelve-month period is less than the minimum royalty fixed in the agreement.

Provision is made in paragraph XII for termination of the agreement by the licensee. Also and in connection with such termination, the paragraph states:

"* * * such termination shall not affect Licensee's obligation to pay any royalty that may have accrued up to the time of such termination, and Licensee agrees to pay Licensors the agreed royalty on all devices covered by any pending application or Letters Patent subject to this agreement then in process of manufacture or then manufactured and in stock, in accordance with the terms hereof, when and as used or sold by Licensee."

In respect to the above quotation, attention must be given to two items: (1) It refers to licensee's obligation to pay any accrued royalty, and (2) specific reference is made to the general royalty payable on devices in stock or manufacture. As to the licensee's obligation to pay accrued royalty, reference to paragraph II shows there is no obligation under the agreement to pay the minimum royalty, but only a statement of the consequences or penalty for nonpayment. On the other hand, the first sentence of paragraph VI binds the licensee to pay the individual royalties on devices covered by Letters Patent:

"Licensee agrees to pay to Licensors upon every device manufactured in the United States and used or sold by Licensee * * * a royalty amounting to fifteen per cent (15%) of the net amounts invoiced by Licensee for the use or sale of such device, * * *."

The second point of paragraph XII, concerning the royalty payable on goods in process or in stock, on termination by licensee, may be, at least through inference, used to strengthen the argument that the parties only considered in executing this paragraph the specific royalty payments for devices in existence.

To summarize, there was never an independent obligation to pay annual minimum royalties, and their nonpayment could only result in loss of license, forfeiting the right to manufacture the patented equipment. The obligation to pay minimum royalty or risk the loss of a license arises only when the ordinary royalty on devices manufactured and sold over a period of twelve months is less than the minimum. The licensors, upon failure to realize the annual minimum royalty, may continue with the contract or may terminate it. This option is their sole right and their sole remedy with respect thereto. To say that an absolute obligation to pay the minimum royalty arises when the licensee terminates is to impose upon the licensee an obligation which did not theretofore exist and which is nowhere imposed by the contract. A comparison of paragraphs II, VI, and XII, shows that the only absolute obligation of the licensee concerns regular royalty on devices manufactured and sold. This may not be extended to include minimum royalty (quite possibly a misnomer) payable to keep the licensee's rights intact.

Wing v. Ansonia Clock Co., 102 N.Y. 531, 7 N.E. 621, 622, decided by the highest court of New York State, is on all fours with the case presently before us. There the contract was a grant of exclusive right to manufacture and sell two classes of musical instruments, each embodying patented improvements. A provision in the contract was made for payment of a minimum sum of $4,000 per annum "by way of royalty above provided for, or otherwise, for the manufacture of piano-fortes, containing five or more octaves, * * * or else forfeit the right to manufacture piano-fortes containing five or more octaves under the foregoing license, if the parties of the first part shall so elect." It further appears in the opinion that a "second clause contains a similar provision for the payment of another sum of $4,000, under the same conditions, on account of other classes of instruments mentioned in the contract." The court stated the question to be:

"* * * whether the undertaking of the company is absolute to pay at least $8,000 in each year, so long as the patentees elect to continue the license in force, although the specified royalties do not amount to that sum, or, on the other hand, whether the company has the alternative to pay the excess over the royalties, up to the sum mentioned, or to refuse to pay beyond the amount of the royalties, subject only to the hazard of forfeiting its right to manufacture, at the election of the patentees."

In deciding the case, the court said:

"* * * The covenant of the company is to pay the sum stated, or else to forfeit its right to manufacture. The contract plainly contemplates alternative situations. The company, in the natural order of events, is first to decide whether it will pay beyond the royalties, or, in default of so doing, subject itself to a liability to have the license revoked. It is not strictly a covenant by the company to do one of two acts; but having, by the contract, an exclusive right to use the patents, on performing the conditions, its election not to pay the gross sum would terminate its right under the contract, at the election of the patentees. A mere right of forfeiture attached to a contract is, of course,

no answer to an action on a covenant of payment, or other covenant of the defaulting party. The forfeiture may be waived, and the remedy is alternative, and not exclusive. But parties may make a forfeiture the only remedy. The contract may give a right upon condition of payment, with a clause of forfeiture if the payment is not made, and make that the only consequence. This, we think, was the intention of the parties in this case. * * *"

Had the parties to the agreement before us intended the licensors to receive each year a minimum royalty absolutely, it would have been easy to express such intent in clear and unambiguous language.

For the foregoing reasons, I respectfully dissent from the majority opinion in this case.